FILED

2011 Aug-05  PM 02:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DAVID FRASER,                        }
                                     }
        Plaintiff,                   }
                                     }        CIVIL ACTION NO.
v.                                   }        10-AR-1217-S
                                     }
COCA-COLA BOTTLING COMPANY           }
UNITED, INC.,                        }
                                     }
        Defendant.                   }

## MEMORANDUM OPINION AND ORDER

Before the court is the motion for summary judgment (Doc. 14) filed by defendant, Coca-Cola Bottling Company, United, Inc. ("Coke United"), as to the claim brought by plaintiff, David Fraser ("Fraser"), under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq* ("ADEA"). Because genuine issues of material fact exist, Coke United's motion for summary judgment will be denied.

## FACTS

The following facts, which because of the procedural posture are presented in the light most favorable to Fraser, are not an exhaustive account of the events surrounding Fraser's termination. Instead, this opinion recounts only those facts necessary to demonstrate the existence of a genuine issue of material fact which precludes a grant of summary judgment, and to comply with the requirement of Rule 56(a) that the court state its reasons. The facts as presented herein are established only for the purpose of

summary judgment, and would have to be proven by Fraser at trial.

Coke United bottles and distributes Coca-Cola products and sells them to retail businesses, including gas stations and convenience stores.  At issue are two different marketing agreements between Coke United and its customers: (1) an Alabama Merchant's Association ("AMA") Agreement; and (2) a parity agreement.  The AMA is made up of convenience store owners who, in exchange for, *inter alia,* devoting more shelf space to Coca-Cola products than to competing products, receive a lower pricing structure from Coke United under the AMA agreement.  Non-AMA retailers sign a parity marketing agreement, under which Coke United charges more for Coca-Cola products than under the AMA agreement.  Walter Body ("Body"), Coke United's Consumer Segmentation Manager, manages the AMA account and is in charge of establishing and deactivating AMA agreements.

Fraser worked for Coke United from 1974 until he was fired in 2009.  Initially, Fraser was hired as a Bottle Truck Route Man, but during more than thirty four (34) years of employment, Fraser worked his way up through the ranks, culminating with his promotion to Area Manager in 2007.  As Area Manager, Fraser oversaw approximately three hundred fifty (350) Coke United accounts in central and east-central Alabama, and supervised about eighteen (18) people, including: five to six (5-6) Advance Sales Supervisors, who take and process orders from store managers; eight

(8) Route Men, who deliver the Coke United products to customers; and three (3) Senior Salesmen.  Dan Gilliland ("Gilliland"), then the Conventional Sales Manager, promoted Fraser to Area Manager, and supervised him in that position.  Gilliland reported to David Gulledge ("Gulledge"), the Birmingham Sales Manager.

The events giving rise to this lawsuit revolve around two gas station/convenience stores located in Eden, Alabama: (1) a Shell station ("Eden Shell"); and (2) a Chevron station ("Eden Chevron")(together, "the Eden stores").  The Eden stores, both of which had Coke United accounts that were managed by Fraser, are owned by the same individual.  Each of the Eden stores was on the AMA account prior to September 2008.  In September 2008, the owner of the Eden stores decided to take the Eden Shell off of the AMA agreement, and instead signed a parity agreement with Coke United. The Eden Chevron remained under the AMA agreement.  Soon after the Eden Shell switched to the parity agreement, Cedric Mason ("Mason"), the Advanced Sales Supervisor for the Eden stores, informed Fraser that the Eden Shell management was unhappy with the price increase for Coca-Cola products.  Fraser passed this information on to Body.  Shortly thereafter, Mason informed Fraser that it appeared as though the Eden Shell was taking Coca-Cola products from the Eden Chevron, rather than buying products from Coke United under the parity agreement.  Fraser again passed this information along to Body, and Body told Fraser that he would check

into the situation and get back in touch with him.

About a week after Fraser and Body's second discussion regarding the Eden Shell, Body informed Fraser that the Eden Shell was going to go back on the AMA agreement, and Fraser passed this information along to Mason. From October 2008 through January 2009, Fraser repeatedly contacted Body to inquire as to whether the Eden Shell had signed the AMA agreement. Each time, Body would tell Fraser that he needed to check the status of the Eden Shell and that he would get back in touch with Fraser.

In early February, 2009, Fraser, Body, and Gilliland had a conversation at Fraser's desk. Fraser asked both Gilliland and Body about the status of the Eden Shell AMA account, and stated that its status needed to be resolved. Body again stated that he would "take care of it." (Doc. 16-1 at 14.) Subsequently, Gilliland and Gulledge began investigating the situation and discovered that the Eden Shell was still on the parity agreement and was receiving Coca-Cola products under the Eden Chevron's AMA agreement. The investigation also uncovered the following facts: (1) on at least one occasion, the route man made two separate deliveries to the Eden stores, even though all of the products were ordered under the Chevron's account; (2) on several occasions, Mason apparently created two invoices, one for the Eden Shell and one for the Eden Chevron, despite the fact that the Eden Chevron ordered all of the Coca-Cola products under its AMA agreement.

4

Coke United views the creation of two invoices for the same delivery as a red flag, and has had trouble in the past with employees who have exploited the differences in pricing plans for personal gain.

On February 25, 2009, Gilliland and Gulledge interviewed Fraser regarding the Eden Shell. During the meeting, Fraser "took full responsibility" for the events at the Eden Shell. (Doc. 16-1 at 19) When confronted with the fact that the Eden Shell was receiving Coca-Cola products under the Eden Chevron's account, Fraser also told Gilliland and Gulledge that it did not matter because Body had already said that the Eden Shell was going back on the AMA account. On the same day, Gilliland and Gulledge interviewed Mason and another Advanced Sales Supervisor under Fraser. Mason claimed that Fraser had authorized the sales to the Eden Shell under the Eden Chevron's AMA account.

The following day, February 26, 2009, Gilliland and Gulledge again met with Fraser, along with a Coke United Regional Human Resource Director. During this meeting, Coke United claims that Fraser admitted that he knew that the Eden Chevron was ordering Coca-Cola products for the Eden Shell. Fraser denies this and, in a sworn deposition, testified that he neither knew, nor admitted to knowing, that the Eden Shell received products which were delivered to the Eden Chevron. Fraser also denied having knowledge of Mason's use of duplicate invoices. During the February 26, 2009

meeting, Gilliland and Gulledge say that they interpreted Fraser's statements as contradictory to his statements made the previous day, and they confronted Fraser with their conclusion.   Fraser responded that Gilliland and Gulledge must have misunderstood his earlier statements.   In particular, Fraser stated that when he claimed responsibility for the events at the Eden Shell, and said that it "didn't matter," he was under the impression that there had been no wrongdoing by Mason.   After learning what had been taking place, Fraser retracted his claim of responsibility.   Apparently, Gulledge and Gilliland were not convinced, and Fraser was terminated.   Mason, who was twenty nine (29) years old at the time and was involved in a similar price manipulation incident in 2007, was also terminated as a result of the events at the Eden Shell. At the time that Coke United fired Fraser, he was fifty three (53) years old.   Matt Hollman replaced Fraser as Area Manager, and although Hollman's age is not specified in Fraser's response to Coke United's motion for summary judgment, Fraser's complaint states that his replacement was twenty-eight (28) years old, an allegation that is not contradicted.

Fraser offers no direct evidence of age discrimination on the part of Coke United, but does cite two inappropriate age-based comments made by his supervisors.   First, in the Fall of 2008, Fraser claims that Gulledge said that he "must have known Moses." (Doc. 16-1 at 24)   Fraser's EEOC charge states that Gulledge

instead said that Fraser "must have known Methuselah," (Doc. 16-1 at 55) but Fraser contends that the discrepancy is due to a typographical error.   Second, Fraser claims that in the fall of 2007, Gilliland said: "I've learned one thing after putting you in this position. . . . [T]he next time I'll get somebody that has more computer experience and a younger person like Kevin Horton to be the next area manager."  (Doc. 16-1 at 25.)

## DISCUSSION

The ADEA provides that:

> it shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1).  When a plaintiff relies on circumstantial evidence to establish an ADEA claim, courts in the Eleventh Circuit use the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *E.g. Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir. 2000).   Under the *McDonnell Douglas* framework, the plaintiff creates a presumption of discrimination by establishing his *prima facie* case.   *Id.*  The defendant can then rebut the presumption of discrimination by presenting its legitimate, non-discriminatory reasons for taking action against the plaintiff.   *Id.*  Where the defendant successfully rebuts the presumption of discrimination,   the

defendant's motion for summary judgment is due to be granted, unless the plaintiff can:

> proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual.

*Id.* at 1024-25.  To demonstrate pretext, it is well-settled that:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Id.* at 1030.

Because Fraser's claim is based on circumstantial evidence, the court's analysis will proceed according to the *McDonnell Douglas* burden shifting framework.  In its motion for summary judgment, Coke United does not contend that Fraser failed to meet his *prima facie* case under the ADEA, and instead argues that it had a legitimate, nondiscriminatory reason for firing Fraser because he lied about his involvement in the events surrounding the Eden Shell.  Coke United contends that on February 26, 2009, Fraser "changed his story" (Doc. 15 at 10) from the day before.  Coke United also states that, on February 26, 2009, Fraser "admitted that he knew about product going from the Chevron to the Shell." *Id.*  Fraser disputes this account, and states that he never knew, nor admitted to knowing, about the Eden Shell's behavior.  Fraser

also states that, rather than changing his story, he was clarifying that he had no knowledge that Mason was creating multiple invoices for the same shipments.  Fraser does not argue with the reasoning or wisdom of Coke United's decision to fire him.  Rather, Fraser contends that the events Coke United asserts to support its decision to fire him did not happen.  Fraser has met Coke United's proffered reason head on and rebutted it, creating a jury triable issue to be decided on credibility.

Circumstantial evidence supports Fraser's contention that Coke United's purported reasons for firing him were not its true motivation.  Indeed, it was Fraser who brought the problems with the Eden Shell to the attention of Gilliland during a conversation with Gilliland and Body.  Fraser repeatedly spoke with Body, the person in charge of the AMA account, regarding the Eden Shell's status.  These are not the actions of an employee attempting to deceive his employer.  Although scant, other circumstantial evidence in the form of comments made by Gilliland and Gulledge—Fraser's supervisors and the ones who made the decision to fire him—supports Fraser's contention that his age was the real reason that he was fired.  In particular, Gilliland's comment that the next Area Manager he hired would be younger than Fraser supports his claim of age discrimination.  Fraser has met his burden under the *McDonnell Douglas* framework, and Coke United's motion for summary judgment will be denied.

9

**CONCLUSION**

For the reasons stated, Coke United's motion for summary judgment is hereby **DENIED**. Pretrial conference is **SET** for **September 22nd, 2011** at **9:30 a.m.,** in accordance with the accompanying pre-trial instructions, unless the parties, **prior to August 22nd, 2011,** request mediation.

DONE this 5th day of August, 2011.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE